The case this morning is 411-0421 Holm v. Memorial Medical Center. For the appellant is John C. Kramer. And for the appellee is John A. Kalaroff.  Kalaroff. Kalaroff, okay. Counsel, you may proceed. May I please report? Counsel. Counsel. Your Honor, we're here this morning on appeal for summary judgment that was granted in this case by the trial court. It is the plaintiff's position to begin, Your Honors, that the trial court erred in granting summary judgment dismissing the plaintiff's retaliatory discharge claim. We believe that there were sufficient facts that sustained that claim, specifically that the plaintiff was discharged. We believe that that obviously is not in dispute in this matter. Second, that in retaliation for her activities, there was clearly motivation factors that we believe lead to a question of fact on that issue. And we also believe that her discharge was in contravention of clearly stated public policy. The facts, Your Honors, that we believe sustained this claim show that the plaintiff began working at Defendant's Hospital in 1983. She began and continued as in the Health Information Management Department. She worked her way up to Operations Manager. Her duties included, but were not limited to, making signing off on medical records, verifying that those were true and accurate. Also, patient record maintenance and release of information. At all times, she performed her job up to the legitimate expectations of her employer. Then, in and around September of 2005, a new supervisor, Kara Guffey, the Senior Vice President, became her supervisor. In and around that same time, a new medical record policy became in place. When that new electronic medical record system was implemented, the plaintiff expressed concerns to her new supervisor. By way of backtrack, I would point out that my client, the plaintiff, was Chapter Champion and put in that position for the hospital for the information management for JACO. So it was her responsibility to make sure that the hospital was going to be in compliance with the new electronic medical record system. Was she responsible for the medical record system? Was she the one that was assigned the project of making the system work? Well, Your Honor, the way I would answer that is that it was one of her tasks to help implement that. But I would say that she had to report to her direct supervisors. She herself would have to report to her supervisors that, in this case, if she had concerns that policies that were in place were not adhering to proper standards and policies regarding confidentiality of the disclosure of patient records. So to answer your question, yes, she was in a position of responsibility, but I would point out that ultimately she had to report to her supervisors. Continuing on, she started to express serious concerns about the new policy or the new implementation of the electronic medical record system at the hospital. First, she pointed out that there could be, under this new system, two different patients' medical records that were accessible by only one medical record number. So, for example, two employees would enter one record number, but each would receive different patients' medical records. She advised her supervisors that this was clearly a concern, not only for confidentiality purposes, but also for medical care that would be provided. She also noted that there were no policies in place regarding electronic signatures to be used in this new system. So, in that instance, there could be multiple electronic signatures used when that needed to be curtailed to only those people that should have electronic signatures being utilized, such as doctors, nurses, and residents. There were not proper identifiers, nor a policy in place with respect to who would be signing off on the medical records and medical documents. There was no policy or procedure in place to check that users were using the signature appropriately, not sharing it with anyone or keeping it confidential. Nor were those policies or procedures on how documents were to be reviewed to make sure that there were no gaps or points in the electronic fields in the new electronic medical record system. These were all complaints that the plaintiff made known to her supervisor, her new supervisor, because these were potential or could lead to potential security violations, entry errors, and improper disclosure. She knew that there could be very serious consequences. What's the law that was being violated here? Your Honor, the law would be the specific policies or regulations that we cite to in our brief would fall under the Illinois Administrative Code, specifically that Section 250.1710. Under this Illinois Administrative Code, Your Honor, it requires hospitals basically to maintain accurate and complete medical records for its patients. It's a public policy to maintain both confidentiality and accurateness of those records. She voiced a concern to her supervisor that those policies, the new medical record system that was being implemented, would be violating confidentiality of patients' medical records, which would fall under that Administrative Code. We also cited 210 ILCS 85-6.17 for protection and confidential access to medical records, federal HIPAA regulations, Illinois laws against fraud, because one of the other concerns that she raised was that in response to requests for records, she was asked to sign off on certifications, certifications that records were both true and accurate. She voiced concern that she could not in good conscience sign off on those certifications. Do we know a specific instance of where she was asked to do something like that that was not correct? Well, Your Honor, she testified in her deposition that she was asked to do that and that she refused to do that. Well, what is it she refused to do? She refused to sign off on certifications with regards to verifying that records were both true and accurate with regards to record requests that were made. And because they weren't? Because they were not. She could not say that they were both true and accurate. Well, I'm not sure I understand what... When a record request would come into the hospital, it was the procedure at the hospital to have a certification, a certification that was signed off up until the point of her complaint by the plaintiff. The certification set forth that the records... These are the medical records from Memorial Hospital for Jensman. Correct. And they weren't? And that they were both true and accurate. Okay. And her concern, Your Honor, was that because of these concerns that she had raised with the new electronic medical record system, that there's no way that anyone, herself or anyone else at the hospital, could verify and certify that those records were both true and accurate. Because there were gaps in the system that allowed, for example, what I had mentioned earlier, one person's medical record could be... or two people's medical records could be pulled up by just one medical record number. Well, but that... I'm trying to identify a specific instance. Retaliatory discharges, tough business, counsel. It is. I'm looking for bright lines. Right. There's this rule, there's this law that I was told to violate, and I refused and I was fired. That might be enough, maybe. What... It seems to me you're talking about some vague concerns. What I want to know is, in a particular instance, with regard to John Smith's medical records, I knew they were inaccurate because X. You know, they included records of Tom Brown. And they weren't just John Smith's. And I wasn't willing to certify that. Do we have that? We do not have that, Your Honor. But what we do have is that she said under the system, under the new electronic medical record system that they did implement, that that very hypothetical that you just posed to me was not only a slim possibility, but a very real possibility because they did not have the procedures in place to verify that something like that would not happen. And so I think under the facts of this case, it's clear, Your Honor, that one... So the medical records she was asked to certify might, in fact, be the medical records for John Smith? Your Honor, if they were lucky, yeah. If the hospital was fortunate enough not to have two different medical or two different patients' medical records pulled up by the one number, yeah. I mean, they were... Are there specific instances of that that she testified to where she saw, I was going to certify John Smith's, and there were Tom Brown's records too? No, Your Honor. There is not. So it's this vague concern that it might happen? Well, Your Honor, I think it's more than a vague concern because what she saw was that this could happen. She herself never set out a wrong person. Well, if a retardant is discharged, don't we need something that it did happen? Your Honor, well... Not that it could? Your Honor, I think, maybe I'm not making myself clear, but what she testified to, I believe, is that she, when implementing this new system, saw this event occur. She herself didn't send out those wrong records that were requested of John Doe when they should have been from some other patient. But what she raised the concern was she saw that these policies that were in place allowed for two different patients' medical records to be pulled up by one number, and she did observe that. But what I'm saying is... Pulled up by whom? I'm sorry? Pulled up by whom? I don't know the answer to that question. Hospital personnel? Yes, within the defendant's hospital, Your Honor. But I don't believe she has a specific circumstance where then those wrong medical records were then sent out, which is what I thought your question was. Well, that was the earlier part of the question. So the internal filing procedures being flawed in her judgment were enough to violate all these various standards? Well, she herself, Your Honor, refused to sign off on the certification. And what had happened was her supervisor then said, well, then I'll sign off on the certifications. But at that point in time, Your Honor, when that occurred in September of 2005, up until this time, Your Honor, she had had no negative remarks with regards to any part of her... Does any of that matter? Well, I think it does in this circumstance, Your Honor, because she voiced concerns regarding Illinois public policy, regarding the importance of confidentiality of medical records and the importance of making sure that medical records, that the preparation of those are accurate. And she voiced those types of concerns that were because of the new electronic medical record system. And at that point in time, we allege that she was retaliated against because all of a sudden, now come December, just a few months later, she receives her first negative review. She's continuing to make complaints to her supervisors about these or raise these concerns. There's testimony on the record, Your Honor, that then her colleagues are letting her know that they want her out. They're trying to get her fired. And, in fact, Judge, because... And there's other things in the record, but she's added job responsibilities and she's not given the same assistance... She's an Antwill employee. She could have been fired, period. I think the retaliation... So none of that other stuff matters at all, does it? I mean, she could be fired or demoted or put into a closet for her new office. The question is, is it retaliatory discharges narrowly defined by the Illinois Supreme Court? Well, Your Honor, I think the facts then go further than that, though, because what happens was when she's not getting a response, she then takes this to the Vice President of Operations. And that occurred on or about June 20th of 2006. And then on that, she calls for a meeting. The plan was then to have a meeting the next day with the appropriate personnel at the hospital to address her concerns and complaints. And instead of having that meeting, they fire her. They terminate her. And, Judge, there's nothing in the record to suggest that she had done anything else... What if her supervisor... I'm sorry, go ahead. What I don't understand is she's the operations manager. She's responsible for bringing the system into compliance. And she can't get it done. Why can't the employer say, This is what we wanted you to do. You can't get it done. We're going to have to let you go. Well, Your Honor, I think I would address that by saying this, is that she did everything within her power to have those issues addressed. And why can't the employer say, You're doing your best, but you can't get it done? We're going to have to get somebody else. Well, Your Honor, well, for instance, her direct supervisor, Ms. Guffey, she refused to address the issue with regards to the certification, signing off on the certifications. In fact, she just went ahead and started... What if she disagreed? What if she thought your client's views and concerns were overstated and unjustified? Well, I mean, she's entitled to her opinion, Your Honor, but that doesn't make it right. Does that exclude retaliatory discharge? Well, it does in this case, Your Honor, because I think under retaliatory discharge, but I think the Illinois Supreme Court said, or was to try to strike a balance, a balance between an employer's right, as you suggest, to fire an employee at will for efficient business operations. But the other part... Or no reason. Or no reason. Hey, she's been dressing like a clown. We don't like it. She's been snooty to the support staff. Whatever. Right. But the other part of that balancing, Your Honor, is that they're trying to make sure that they're guarding against or guarding for an employee's interest in earning a livelihood and the society's interest in seeing that its public policies are carried out. But don't you have to demonstrate to, as a matter of certainty, that there is some policy here that was being violated, there was some law being violated, as opposed to these concerns of, gee, this might have happened, or the certifications might not have been sufficiently accurate. And for that matter, you know, internally at the hospital, some people being inadvertently getting records they shouldn't get. I'm not even sure. Is that a violation of the policy to you? I mean, you know, that's like going back into the old paper filing days. We had insufficiently trained clerks who were dropping files, Smith's paperwork into Brown's files. You know, it seems I'm having trouble understanding the clear violation of some law as demonstrated in this record that constitutes a basis for retaliatory discharge. Well, Your Honor, I think that even in the Turner case that's relied upon by the matter in response to the appeal, and in their motion for summary judgment in the Turner decision, the Illinois Supreme Court also mentioned that there is a policy, a public policy to guard the confidentiality of the patient's medical records. And I believe that in addition to that, we have a circumstance where she's complaining about a new procedure, a new medical record policy that's implemented that clearly allows for medical records. Maybe. Your Honor. Is that, you know, and I know there's a summary judgment stage. Has that been established? Have you presented evidence to establish that this is the case? Yes, Your Honor. I believe that we have in the record established that. When I was answering your earlier question again, I don't believe that we have a circumstance in the record where then that was, both records were actually sent out. I'm not aware of that actually happening. But she has seen and testified that this was possible, that these breaches that, you know, multiple people could access medical records, there was no policy in place about who, when and where medical records could be looked at. Again, Justice Cook's question. She's in charge of the department. Does the record show what efforts she made to fix this? Yes. And how she was stymied in her efforts to fix it? I believe it does, Your Honor. Tell me what those were. Okay. The record's clear that she, on a continual basis, had raised these concerns to her supervisor. In fact, her supervisor, Ms. Guffey, and we cited this in our brief, said the plaintiff's refusal to certify medical records was an eye-opener. She was too focused on policies. The plaintiff was always bringing up concerns about the electronic medical records. Maybe I'm not being clear. The question is, I have these concerns about these medical records. I want to fix it. It's my department. Right. What did she do to fix it? Well, Your Honor, I would say, as I discussed early on in my argument, she herself was the manager of the department. It was not her job. She could not, in and of herself, make the changes to the electronic medical record system that she wanted changed without the support of her supervisors that she was bringing these complaints to and concerns. Well, what did she do to try to fix it where she was stymied? Well, she raised them. That's not my question. Okay. What efforts did she make? To explain, this is what we need to do to correct it. So if you punch in this number, we're going to get only this one record. Right. And this is what I'm proposing we do to correct it. And they stopped her from doing that. What is there in the record to show that? In the record, Your Honor, I think that she came forward with suggestions as to making sure that there would be proper identifiers for the people that were accessing it. That's a good point. Why didn't she just establish it? Why suggestions? Isn't this her department? Well, Your Honor, it is. But this new electronic medical record system encompassed many different departments within the hospital. And so she couldn't just herself, okay, get in and change the electronic medical record system all by herself to make sure that all of these changes came into place. She would need the assistance and the approval from her supervisors to have other departments work with her in order to make these types of changes. Okay. Your time is up. You get an opportunity to address this again. Okay. I appreciate it, Your Honor. Okay. Counsel, you may proceed. May it please the Court. Counsel. Counsel. My name is John Karoff. I represent Memorial Medical Center. I think I'll start by giving the Court some background on this whole evolution from paper records to electronic records, which is kind of more of this case. In the past, a hospital had a paper-based system. You'd go to the hospital. You'd see your doctor, your nurse. They'd write something down on a piece of paper, and that became your record. They then went to an environment in September of 2005 where it was now electronic. Instead of writing it on a piece of paper, it went into a computer. In the past, the records area, which Ms. Olm supervised, would be asked to certify records. They'd take the paper record, copy it, sign off on it, and send it out. There might be errors in those records because human beings make errors. The electronic record is no different. Things put in the computer might be an error. What Ms. Olm was asked to do on these certifications is just simply to say, is this a true and accurate copy of the hospital's record? Whether it's paper or electronic, it really makes no difference. It's just simply saying, is this what the hospital has? That's what she refused to say, I'm not going to take part of this process anymore. What is she really objecting to? That's a hard thing for us to understand, too, because really the world had not changed in the sense that all she was being asked to do was to tell subpoenaed parties, outside third-party world, that this is what the hospital record is. And so her supervisor is understandably baffled by why there is this now concern about it. The issue about these items not being in place, Justice's points are very accurate. She did run the department. If there are issues that are not being done, things not in place, it's your job to come up with a solution. She is a manager, not just a rank-and-file clerk. But there's also the argument that other departments are involved, and she couldn't make the changes on her own. She had to work through management. She did have to work through management. That's a correct point. There was computer personnel who had to chime in on how this process worked. There were other folks on the medical staff who would have to sign off on things. So she was not a one-person correction process, but it was her job to forward the policy statements itself to go through the chain of command. She told her supervisors, I'm having problems getting all this stuff done. They hired consultants to help her. The record reflects that a particular group was hired at Ms. Ohlm's suggestion to come in and consult with her on issues of policy development. And what the supervisors found is she put them to work on other issues, not the medical record correction issue, but she utilized them elsewhere. And so when the supervisors looked back to her, she continued to say, well, these policies aren't done. Why didn't you use the consultants that we hired for you? She had no answer. So she did have capabilities. The supervisors did not stymie her. In fact, they tried to help her do her job to run this department because it was in everybody's best interest that the medical records department was functional, was accurate. These were all under control. They speak to her that this was kind of the beginning of the end for her. It gave her the first negative review in all those years. I would ask the court to review her review in the record. It's a review in which she, in fact, got a merit bonus based off of the comments issued by her supervisor, Ms. Guffey, this supposed evil person who was out to get her. Well, I raised the question earlier with other counsels. Does any of this matter for us, retaliatory discharge termination here? You don't have to get to that point if you say there's no public policy at issue here. It only matters if you get past that to say what was the true intent. Well, I think, you know, then if we have to get past that, you lose. This is summary judgment. If we have a general initial material fact, then we're going to be presenting all this to the jury. But this is a question of retaliatory discharge as a matter of law. That's where your focus should be, counsel. I agree. I think that is the clearest route to victory, and it's what we argued most to the court. The public policy has to be under the court standards a clearly defined public policy. It has to be something that the courts have reviewed now and said. Well, you heard counsel's argument about the clearly defined public policy that was being violated here, and that's what her problem was. Why is he wrong? Because there is no policy which says hospital records can only be released. There's no law which says hospital records can only be released if they're 100% accurate and all of your policy procedures are in place. Had that law been in place, and she says, gee, we don't have that, he may have a point. But that is not the law. There is no law which says all hospital policies have to be in place before you can release a medical record. That's what is at the core of this case. And because that doesn't exist, they have no public policy to hang their head on. The court has in the past addressed the issue of this whole context of cases rising out of the medical arena, the whole general concern about public policy, general health and welfare of our medical system, and the Supreme Court has told us in Turner that that's not enough. And that basically cited this court, or followed this court's preliminary opinion on that matter, saying that when you're just talking about health care in general, there's no special rule there. You still have to show us a public policy. And in this case, without that law, without that decision in place, they have nothing to hang their head on. She was never asked to do anything that violated any law. She simply was running her department and would not go further on sending out records. So if I understand your position, it's going to be we're asked for these medical records, this is what Memorial Hospital has, and she should certify it. If there is the possibility of an omission or a possibility of some erroneous inclusion of some other records, that this is no different than it might have been the case back when it was still paper? Exactly right. If they just pulled a file and said this is John Smith's file and we're certifying it, that's what Memorial Hospital has on John Smith? They get a subpoena from a litigant in litigation saying we want the record of John Smith. It's not Memorial Hospital's job to go into the record and annotate it or do anything to it that might destroy evidence, it's to say this is what we have, we're giving it to you. So your position is the response of Memorial Hospital is no different to electronic stuff than had something been misfiled in John Smith's file that doesn't belong there or something that should have been there was inadvertently omitted? That's exactly right, Your Honor. They have an obligation upon receiving a request to give it their best effort, obviously, to give them the records they have, but if the records themselves have errors in them, that goes to the subpoenaing party to ferret out and figure out if there's something about the weight of this evidence that is less than need be. What about the argument counsel made that, gee, if I've seen that there are these potential flaws that we're not going to be as accurate as we should be electronically, then I can't certify this stuff because in any given case, the certification wouldn't be correct? It strikes me as, again, hypothetical because you had no exact examples of how that could happen. And secondly, the... Well, from your point of view, in order to support the retaliatory discharge claim, must he be able to cite a specific instance where she was called upon to certify records that she knew and the hospital knew to be wrong? I believe she does. Otherwise... Is there anything in this record to support that, to show that? No. Not in my opinion, Your Honor. The record contains nothing more than her fears, if I can put it that way, that this new system, electronic system, which she's not comfortable with, could potentially have problems. So in other words, your understanding of the argument is, this new system isn't good enough to permit me, she says, to certify these records because I know from other instances where they were either incomplete or inaccurate. I think it's even a little different than that. I think her position is, my understanding, as I read her deposition transcript again and also looked at the transcript of her supervisor is, this new medical electronic record is different. I'm a person who has a problem with change. I need to be really super comfortable before I can embrace change, and I just can't get there. Well, that may be the underlying basis, but, of course, that's not the claim. That wouldn't be a claim justifying retaliatory discharge. But the claim really is, this stuff I'm asked to certify is just not good. To what extent could that ever work? I mean, what if she, for instance, had personal experience of the last 25 requests for certification she had checked and found in every instance there were omissions or things misfiled, some other file going out. Wouldn't that be enough to say in the next one, maybe they weren't sent out. Maybe she caught them and corrected them. The next time, say, no, I don't want to send this out without doing that. Again, as we pointed out earlier, if we get back to what is the core law here, that what is the public policy statement we're trying to protect? Unless we have some law which says the hospital shall not send out anything but a 100% accurate record, we don't have that public policy piece. Is your position that her concerns are too vague? They're absolutely too vague. And there's no law that gives substance to allow her to have those concerns in a retaliatory discharge context. You made reference to the Turner case. How do you think it applies here? The Turner case, again, is our most recent word from the Supreme Court, at least at the time of briefing, of what the retaliatory discharge cases are and how they should be interpreted. The court took that opportunity to once again very narrowly define what retaliatory discharge is. They even commented on the occurrence of Justice Appleton, who even kind of invited them to relook at that whole area, particularly in the area of health care. And the Supreme Court was very clear, I thought, in saying that this is still a very, very narrow area of the law. You have to have that public policy, and the discharge itself must impact that public policy that you cite in your record. And so I cite the Turner case for the position that that is still the law of the state that the circuit court and other courts must abide by. A question presented earlier about what was done to stymie her efforts to make this change. I wanted to respond to that. Keep in mind this is a person who had a 25-person department under her control. She was the manager of that department. She had ample resources to try to address these issues. Another comment was raised that she raised these issues again in June, on June 20th, but the record does reflect that by June 15th the decision was made to let her go. So her June 20th activity has no relevance in this case. The other points I would raise regards to the retaliatory discharge category. The courts have clearly said we do not include in the retaliatory discharge the category of a person who is simply trying to raise a purely personal, private dispute with their employer. And I think the record in this case is very clear that things such as office location, when she can take her personal vacations, who she can delegate work to, all stand out. This is a person raising personal disputes, not issues of public policy. It also speaks to the issue of who are you blowing the whistle on. In this case, or in the case law, you blow the whistle on some activity of the hospital, and in this case all she's really doing is blowing the whistle on herself. This was her department. While she could not control the entire process, she could certainly control the piece of sending the policies, send them up the chain of command, and she did not do that. She claims her vast array of experience, yet did not produce the result. She was not some entry-level clerk. She was the operations manager and had the ability to do this if she wanted to put her mind to doing it. So I think the record in this case is clear, Your Honor, is that she does not meet the narrow category of what's required to be in a public policy area of retaliatory discharge, and we would ask that the Supreme Court be adjourned. Thank you, counsel. Any rebuttal, sir? I'll keep it brief, Your Honor. Okay. Your Honor, I think there can be, it should be emphasized that she gives, I believe in the record that supports this, specific examples of what she believed the failures of the new electronic medical record system were, and that how those raised concerns with regards to public policies concerning accuracy of medical records, confidentiality of medical records for patients. Counsel argued with regards to a point on what specific law was violated, and I think what we have here is policies, regulations that are in place here in the state that she believed were being violated, and that as a result of this new electronic medical record system. However, in one of the cases that we cite to, Your Honor, that's the Tanzer case versus the Art Institute of Chicago case, and that was a case decided back in 2003, and that was a Northern District Federal Court decision. In that case, Your Honor, what had happened was the retaliatory discharge claim that was filed by the plaintiff was upheld, even though there was not one specific law or rule or regulation that was cited to have been violated. What the court thought was that just the plaintiff's good faith belief that she would be committing a fraud by doing the actions that were proposed by the defendant in that case was grounds enough to support a retaliatory discharge claim. And in this case, I think somewhat analogous to that point, Your Honor, is that here she thought that she would be committing a fraud if she were to do that. Also, as we pointed out in our brief, Your Honor, that to falsely certify records that are being requested can be punishable by a fine. And so it was significant enough for the legislature to believe that there would be a fine in place if certifications were falsely made. In addition, Your Honor... What about the comparison counsel drew to the time of paper records, where people were saying, I want the records of John Smith from Memorial Hospital. Someone would pull, literally, a paper file. Right. There's the contents, make copies, certify this is our record. That's what she would do, or someone under her direction would do, I take it. What was her obligation to ensure that nothing was inadvertently included and nothing was inadvertently excluded? Well, presumably, Your Honor, the plaintiff and or anyone in her department would, when copying those records, do their best to make sure that the records were accurate and complete and that the response was made for the correct patient. In this case, what I think... What do you mean? They go through the stack of 50 pages and make sure that they were all John Smith and not one made reference to Tom Brown? Well, Your Honor, I think what is maybe more analogous would be in a situation where they saw a piece of paper when they were just doing the record keeping before the electronic medical record, and they saw records they'd stamped that belonged to another patient. They would exclude it? They would make sure that those weren't sent out. Well, of course, she could do the same thing. If she saw that we're going to be sending out records on John Smith and there was some Tom Brown records electronically to be included, they'd exclude it, couldn't you? Well, Your Honor, I think the plaintiff would have done everything that she could to do that. But what happened in this case is that her supervisor said, Oh, fine. If you're not going to certify these, I'll just sign off on the certification. And I think that's different. And I think what rises here is enough of a specific policy regarding the accuracy of medical records that are kept, the confidentiality of those records, and for her complaint. And I don't believe that summary judgment should have been. I'm trying to think what the medical center would do if they accepted her argument nobody should sign these medical records. You just tell the court, Oh, we're sorry. We aren't going to be able to certify these records. Can I answer, Your Honor? Please. What I would say, Your Honor, is that, and they argued this in their brief, but my response in the brief and here before you is, well, they did have a different alternative. The different alternative was to correct it, was to correct it so that there were proper identifiers. In response to the subpoena, you would say, we're going to correct our records, we'll respond in six months? No, Your Honor. I think what they could have done is one of two things. I don't believe there's been any testimony by the defendant that it would have taken six months to correct that. But whatever delay, they should have been able to address her concerns and fix the problem. Or alternatively, Your Honor, they could have sent the records, but they don't have to sign off on a certification verifying the accuracy of those records when they know that they have a procedure in place where it calls into question that very certification. Okay. Thank you, Counselor. Thank you, Your Honor. Thank you for your advisement. Be in recess until this afternoon.